**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

ARI BRUMER,

        Plaintiff,

    v.

CORESITE, L.L.C. (FKA CRG WEST, LLC), a Delaware
Limited Liability Company; CORESITE REALTY CORPORATION,
a Maryland Corporation; CORESITE, LP, a Delaware Limited Partnership;
THE CARLYLE GROUP, LP, a Delaware Limited Partnership;
CARLYLE REALTY PARTNERS, LP, a Delaware Limited Partnership;
CARLYLE REALTY PARTNERS II, LP, a Delaware Limited Partnership;
CARLYLE REALTY PARTNERS III, LP, a Delaware Limited Partnership;
CARLYLE REALTY PARTNERS IV, LP, a Delaware Limited Partnership;
CARLYLE REALTY PARTNERS V, LP, a Delaware Limited Partnership;
THOMAS M. RAY, in his individual and official capacity;
GEORGE RUHLEN, in his individual and official capacity;
and DOES 1-20,

        Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

    Plaintiff Ari Brumer, for this Complaint and Jury Demand, alleges as follows:

**<u>INTRODUCTION</u>**

    1.    The claims for relief in this Complaint arise from Defendants' fraudulent inducement of Plaintiff to accept employment as their General Counsel, breach of their promises concerning his compensation, and wrongful and retaliatory termination in violation of public policy.

2.     As discussed fully below, Defendants fraudulently induced Plaintiff to join them as General Counsel through the promises of a significant and valuable equity position; failed and refused to fulfill the promise of a significant and valuable equity position; and terminated Plaintiff in retaliation for his good faith and correct opinion in accordance with his ethical obligations as an attorney that Defendants and certain of their officers committed illegal and improper acts and to avoid their promise of giving him an equity position in a viable company.

3.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered actual damages, special damages, and other damages in an amount to be presented at trial.

## JURISDICTION AND VENUE

4.     Plaintiff Ari Brumer is an individual residing in Valencia, California, and is an attorney licensed in California.

5.     Upon information and belief, Defendant CoreSite, L.L.C. (f/k/a/ CRG West, LLC) is a foreign limited liability company organized under the laws of Delaware, but headquartered and licensed to do business in Colorado with its Colorado headquarters located at 1050 Seventeenth St., Suite 800, Denver, CO 80265.  According to the Colorado Secretary of State, CoreSite, L.L.C. has a principal place of business at 1001 Pennsylvania Avenue, Suite 220 South, N.W., Washington, DC 20004.

6.     Upon information and belief, Defendant CoreSite Realty Corporation is a foreign corporation incorporated under the laws of Maryland but headquartered and licensed to do business in Colorado.

7.     Upon information and belief, Defendant CoreSite, L.P. is a foreign limited partnership formed under the laws of Delaware, but headquartered and licensed to do business in Colorado. The entities referred to in paragraphs 5-7 are collectively referred to herein as "CoreSite".

8.     Upon information and belief, Defendant The Carlyle Group, LP is a foreign limited partnership formed under the laws of Delaware, and licensed to do business in Colorado, with a principal place of business at 1001 Pennsylvania Ave., Suite 220, South, N.W., Washington, D.C. 20004.  The Carlyle Group regularly conducts business in Colorado and it, and/or its affiliates, are the sole owners and operators of CoreSite.

9.     Upon information and belief, Defendants Carlyle Realty Partners, LP, Carlyle Realty Partners II, LP, Carlyle Realty Partners III, LP, Carlyle Realty Partners IV, LP and Carlyle Realty Partners V, LP, are each foreign limited partnerships formed under the laws of Delaware, and licensed to do business in Colorado (collectively referred to herein as the "Carlyle Funds"), each with a principal place of business at 1001 Pennsylvania Ave., Suite 220, South, N.W., Washington, D.C. 20004.  The Carlyle Funds regularly conduct business in Colorado and are four real estate funds that are owners of CoreSite, L.L.C.

10.     Upon information and belief, Defendant Thomas M. Ray is an individual residing in Denver, Colorado and/or Broomfield, Colorado, and is an attorney licensed in Colorado (Inactive status).

11.     Upon information and belief, Defendant George Ruhlen is an individual residing in Washington, D.C. and/or Santa Fe, New Mexico, and is an attorney licensed in New Mexico (Active status) and Illinois (Inactive status).

12.     This is a civil action over which this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 as it involves citizens from different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.     Personal jurisdiction exists over Defendants CoreSite L.L.C. (fka CRG West, LLC), CoreSite Realty Corporation, and CoreSite L.P., because those entities are all headquartered and licensed to do business in Colorado and regularly conduct business in Colorado.

14.     Personal jurisdiction exists over Defendants The Carlyle Group, LP, Carlyle Realty Partners, LP, Carlyle Realty Partners II, LP, Carlyle Realty Partners III, LP, Carlyle Realty Partners IV, LP, and Carlyle Realty Partners V, LP, because those entities are the sole owners and operators of CoreSite, they share the same principal place of business address as CoreSite, and they regularly conduct business in Colorado.

15.     Personal jurisdiction exists over Defendant Thomas M. Ray because he is a Colorado resident.

16.     Personal Jurisdiction exists over Defendant George Ruhlen because he regularly conducts business in Colorado and has minimum contacts with Colorado, including through the day-to-day operation of CoreSite and regular air travel to Denver to attend meetings and presentations involving CoreSite and Carlyle.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because some Defendants reside in the District of Colorado and a substantial part of the events or omissions giving rise to this Complaint occurred in the District of Colorado.

## **FACTUAL BACKGROUND**

18.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

19.     Plaintiff is an attorney licensed in California with more than thirteen years of experience dealing with commercial real estate, telecommunications and other corporate transactions, with an emphasis on acquisitions and dispositions, leasing, licensing, and financing.

20.     Defendant CoreSite develops, owns, and operates data centers and office buildings around the United States and is headquartered in Denver, Colorado.  CoreSite essentially leases/licenses space for small and large businesses around the world to store equipment and CoreSite then sells power, telecommunications connections, security, and specialized humidity and temperature controls to those businesses.

21.     Defendant The Carlyle Group, is a global private equity firm which claims to have over $90.5 billion under management.  The Carlyle Funds are owned and operated by The Carlyle Group in Washington, D.C.  The Carlyle Group and the Carlyle Funds are the sole owners and operators of CoreSite, and CoreSite advertises itself as a Carlyle portfolio company and a wholly owned operating partner and subsidiary of The Carlyle Group.

22.     Defendant Thomas M. Ray (an attorney, on Inactive status in Colorado) is the President and CEO of CoreSite, as well as a member of CoreSite's Board of Directors.  He is also a Managing Director of The Carlyle Group in Washington, D.C., and has been for many years.  Defendant Ray acted individually and on behalf of the corporate and limited partnership Defendants in his unlawful and wrongful conduct as described in this Complaint.

23.     Defendant George Ruhlen is a Managing Director for Carlyle and is intimately involved in the day-to-day affairs of CoreSite.  He is also an attorney, licensed in New Mexico (Active status) and Illinois (Inactive status).  Defendant Ruhlen acted individually and on behalf of the corporate and limited partnership Defendants in his unlawful and wrongful conduct as described in this Complaint.

24.     Plaintiff was a partner at a large well-established law firm based in Los Angeles, California, with a successful real estate practice, wherein he was earning a base salary in excess of $400,000 per year, with an annual bonus of approximately $100,000 (subject to increase).

25.     Plaintiff had a multi-million dollar growing book of business and represented various individuals and businesses, including public companies and public REITs, in negotiating large and complex real estate and other transactions.

26.     In that capacity, Plaintiff represented Defendants CoreSite, Carlyle, and other affiliated entities as outside counsel for almost 10 years.

27.     During his many years as outside counsel, Plaintiff developed a close and trusting relationship with Defendant Ray, President and CEO of CoreSite and a Managing Director of The Carlyle Group.

28.     As outside counsel, Plaintiff consistently did outstanding work for Defendants and their companies, generating and/or saving them hundreds of millions of dollars.  In fact, CoreSite's S-11 filed by Defendants with the United States Securities and Exchange Commission (referred to herein as the "SEC") on May 13, 2010 (referred to herein as the "S-11"), and

CoreSite's own website, stated that "Mr. Brumer has provided counsel to the company since 2002 and has led the company's real estate and financing efforts since that time."

29.     As a direct result of those efforts and successes, Defendant Ray offered Plaintiff a position as General Counsel to CoreSite in November 2008 (at that time, CoreSite was still known as CRG West, L.L.C., or "Carlyle Realty Group West").

30.     Defendant Ray offered Plaintiff a base salary of $185,000 with a discretionary target bonus of $100,000.

31.      In response, Plaintiff told Defendant Ray that he was extremely concerned about the lower base salary, and would likely not be able to make the transition work, because he was earning substantially more in his position as a partner with a major Los Angeles law firm, and the move would require him to sell his real properties in Los Angeles at substantial losses, with severe adverse affects on his credit and associated tax liabilities.

32.     In response, Defendant Ray, both individually and on behalf of CoreSite and Carlyle, expressly and repeatedly represented and stressed to Plaintiff that the lower salary would be offset by a significant and valuable equity position in CoreSite, which he intended to take public through an "IPO" or initial public offering, and that being named General Counsel of a public company would enhance Plaintiff's credentials and help ensure a lucrative future, and that Plaintiff should leave his partnership position at his law firm and make the move to Denver.

33.     Defendant Ray, both individually and on behalf of CoreSite and Carlyle, also expressly and repeatedly represented to Plaintiff and assured him that while CoreSite was

planning a major IPO, Plaintiff's relative lack of securities experience was not an issue and would never be an issue.  Defendant Ray assured Plaintiff that he could either hire a junior securities lawyer or quickly educate himself concerning securities law.  Plaintiff repeatedly inquired as to whether his lack of securities experience would be an issue and Defendant Ray repeatedly assured him it was not.

34.     Defendant Ray and CoreSite/Carlyle submitted an offer letter to Plaintiff dated December 11, 2008.  That offer letter expressly provided that Plaintiff's compensation package would include the following, among other things:  base compensation of $185,000; discretionary annual bonus of $100,000; relocation expenses of $75,000; and "Participation in Company equity program."   Defendants confirm in CoreSite's S-11 that "For Ms. Beckman and Mr. Brumer, both of whom joined us in 2009, compensation levels were determined by our Chief Executive Officer and Carlyle based upon their view of the compensation that was necessary to attract Ms. Beckman and Mr. Brumer to serve as our Chief Financial Officer and General Counsel, respectively, and upon individual negotiations with each."

35.     The offer letter expressly stated that the details concerning the equity program would be provided "under separate cover."

36.     Prior to signing the offer letter, Plaintiff repeatedly requested additional information concerning CoreSite's equity program from Defendant Ray and others.

37.     Defendant Ray and others at CoreSite and Carlyle continued to assure Plaintiff, both orally and in writing, that the equity agreement would arrive shortly after being hired.

38.     At one point, Defendant Ray, both individually and on behalf of CoreSite and Carlyle, represented in writing that Plaintiff should expect to receive at least 0.70% of the promote pool from CRG West, L.L.C. (now CoreSite), and that the anticipated equity payment to Plaintiff (over a maximum period of 3 years) would be equal to a minimum of $550,000.00. Defendant Ray, both individually and on behalf of CoreSite and Carlyle, also represented that he strongly felt the actual payments to Plaintiff would be significantly greater.

39.     The equity agreement was an integral part of Plaintiff's compensation package and upon which Plaintiff relied to terminate his prior employment, sell his real properties in California at substantial losses (and incurring severe damage to his credit and increased tax liabilities), leave his partnership position at a major Los Angeles law firm, move his family from California to Colorado, and accept the offer of employment from CoreSite in Denver, Colorado.

40.     Plaintiff executed and accepted the offer of employment presented by Defendants on January 14, 2009, and commenced his employment at CoreSite on February 23, 2009, again in reliance upon the express promise that an equity agreement would follow shortly.

41.     Plaintiff did not receive any type of written equity agreement until December 2009, almost a year after the commencement of his employment, and only after an inordinately lengthy and frustrating process involving Defendant Ruhlen, Managing Director of the Carlyle Group, others at Carlyle, CoreSite, and Defendant Ray.

42.     The final equity agreement was drafted by Defendant Ruhlen and others at Carlyle after many substantial and unanticipated changes (which continued to diminish

Plaintiff's equity position, and enhance The Carlyle Group's and the Carlyle Fund's economic positions).  Defendant Ruhlen instructed Plaintiff to submit the appropriate forms to the Internal Revenue Service as a result of the final equity agreement.

43.     After receiving the written equity agreement, Plaintiff subsequently learned that the agreement was worthless.  Defendants had provided him with equity in a shell company that had no intentions of going public (the "Shell Company").

44.     According to the Operating Agreement for the Shell Company, the only purpose of that company was to grant certain management of CoreSite ownership in the company in order to provide the mere illusion of equity.

45.     Indeed, Plaintiff subsequently discovered that the Shell Company did not own any assets and would never own any assets.  The equity granted in the Shell Company to Plaintiff was, therefore, obviously worthless.

46.     The Shell Company was yet another Carlyle portfolio company and was formed by Carlyle.  Carlyle, and its affiliated entities, were listed as majority owners of the Shell Company.

47.     Plaintiff immediately brought to Defendants' attention that they breached their promise and representation to give him a significant and valuable equity position in CoreSite, in that the equity in the Shell Company was worthless.

48.     Instead of remedying the breach and fulfilling the promise upon which Plaintiff reasonably relied, Defendant Ray, both individually and on behalf of CoreSite and Carlyle, told

Plaintiff that Carlyle and CoreSite would have to draft a new equity agreement from scratch.

49.     One week prior to Plaintiff's termination, Defendant Ray told him that the new proposed equity agreement would likely result in Plaintiff's resignation, as Defendant Ruhlen was now insisting upon significantly reducing the equity positions of the CoreSite employees in direct contravention of Plaintiff's agreement.

50.     Plaintiff never received any compensation in the form of equity as originally and repeatedly promised.  Defendants' promise of equity ownership never occurred and was false.

51.     Plaintiff has also since learned that Defendants have engaged in a disturbingly similar pattern and practice of luring senior employees, including relocating some of them to Denver (including Plaintiff), with promises of equity, and then failing to fulfill those promises, and/or have terminated senior executives (including officers and C-level executives) prior to, and without, satisfying equity payment promises and/or other obligations.

52.     Plaintiff was an exemplary employee.  His performance reviews were consistently positive, and he was instrumental in many significant deals, including building and leasing Defendants' most successful data center ever.  CoreSite in fact appointed Plaintiff as an officer with full signing authority and responsibility for all CoreSite entities after less than one year at the company.

53.     Plaintiff also provided significant assistance to CoreSite and Carlyle in their efforts to take CoreSite public and to submit an IPO.

54.     As CoreSite publicly stated in two Amended S-11's filed with the SEC on June 29, 2010 and July 27, 2010 (collectively, the "Amended S-11"), Plaintiff discovered that CoreSite and certain of its officers were involved in or committed certain illegal or improper acts and in violation of Plaintiff's obligations of professional conduct.  Plaintiff notified Defendants of these illegal or improper acts and Defendants were aware that Plaintiff was not going to acquiesce in the illegal or improper acts.  Defendants were also aware that the illegal or improper acts potentially subjected Plaintiff to sanctions or violations of his code of professional responsibility.  Defendants acknowledge that they received notice of the specific illegal or improper acts in their Amended S-11.

55.     On May 23, 2010, only one business week after CoreSite publicly filed the S-11 with the SEC, and shortly after Plaintiff vigorously objected to Defendants' illegal and improper acts, Plaintiff was terminated as a retaliatory direct result.

56.     Defendant Ray, both individually and on behalf of CoreSite and Carlyle, initially explained that his colleague, Defendant Ruhlen, and their boss, Robert Stuckey, had ordered Plaintiff's termination.

57.     Defendant Ray then recanted and said it was his decision as the CEO.  Contrary to his prior knowledge when first hiring him, and contrary to Defendants' repeated representations and assurances, Defendant Ray told Plaintiff that his employment was terminated due to his relative lack of securities law experience.  Defendant Ray also stated that he needed to "remove Mr. Brumer from the balance sheet," which Plaintiff interpreted to mean, in part, that Defendant Ray needed to eliminate the equity position repeatedly promised to him.

58.     There was no indication whatsoever at any time that Plaintiff's lack of securities experience was an issue, and Plaintiff was repeatedly assured by Defendant Ray, both individually and on behalf of CoreSite and Carlyle, that this was not an issue, nor had it ever been brought up as an issue over the course of his employment.

59.     Notably, just one business week prior to Plaintiff's termination, Defendants publicly disclosed Plaintiff as their General Counsel in the S-11 filed with the SEC, along with an extensive list of his credentials, including the statement "Mr. Brumer has provided counsel to the company since 2002 and has led the company's real estate and financing efforts since that time."  Defendants also introduced Plaintiff as their General Counsel at the IPO kick-off meeting with bankers and lawyers, which included colleagues and others that Plaintiff knew from previous and ongoing dealings, including in Colorado, California and Illinois.

60.     After Plaintiff was wrongfully terminated, CoreSite filed its Amended S-11 and publicly announced therein that Plaintiff had been terminated and that "Mr. Brumer alleges, among other things, that his employment was terminated in retaliation for his assertions that we have been involved in or committed certain illegal or improper acts."  Defendants then attempted to refute those alleged "illegal or improper acts" in the Amended S-11 and disputed that his termination was a result of those acts.

61.     Plaintiff's career has been significantly damaged as a direct result of Defendants' wrongful conduct in this matter, not the least of which is Defendants' public notification of Plaintiff's termination just one business week after filing the S-11 with the SEC, with Plaintiff listed as General Counsel and an officer.

62.     Although Plaintiff is now in private law practice in Valencia, California, he has lost significant income and has suffered other significant economic damages, including past and future wage loss, loss of promised equity, lost profits, special damages, emotional distress, and other damages as a direct result of Defendants' wrongful and fraudulent conduct.

## FIRST CLAIM FOR RELIEF

### (Fraud And/Or Fraudulent Inducement Against All Defendants)

63.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

64.     Defendants made numerous material misrepresentations of fact and/or material omissions when knowingly misrepresenting that Plaintiff would receive a significant and valuable equity position in CoreSite, at the time he was contemplating an offer of employment at CoreSite.

65.     Defendant Ray, both individually and on behalf of CoreSite and Carlyle, expressly represented to Plaintiff that he should not worry about the lower salary being offered him because he would make up the difference with a significant and valuable equity position in a publicly traded company and a position as General Counsel of a publicly-traded company.

66.     Defendant Ray, both individually and on behalf of CoreSite and Carlyle, expressly represented that such equity position would likely include 0.70% of the profit pool of CRG West, L.L.C. (now CoreSite) and that the anticipated equity payment to Plaintiff (over a maximum period of 3 years) would be equal to a minimum of $550,000.00, but likely more.

67.     Defendants were fully aware that Plaintiff relied upon this promised equity position in deciding to terminate his prior employment as a partner at a major Los Angeles law firm; selling his real properties in Los Angeles at significant losses (and incurring severe damage to his credit and associated tax liabilities); moving his family from California to Colorado; and accepting employment at CoreSite at a significantly reduced salary.

68.     Defendants were fully aware at the time they made these material misrepresentations that they had no intentions of satisfying said promises and knew that they were not going to provide Plaintiff equity in CoreSite or any other publicly traded or meaningful company.

69.     Defendants made material and fraudulent misrepresentations that Plaintiff would receive a written equity agreement that would reflect a significant and valuable equity position in CoreSite, both before and after Plaintiff accepted employment.

70.     Plaintiff did not receive any type of written equity agreement until December 2009, after an inordinately lengthy and frustrating process involving Defendant Ruhlen, Managing Director of the Carlyle Group, others at Carlyle, CoreSite, and Defendant Ray.

71.     The final equity agreement was worthless and Defendants knew it was worthless when they drafted it and provided it to Plaintiff.

72.     Defendants knew that the equity agreement provided Plaintiff "equity" in a Shell Company that was solely intended to grant Plaintiff the mere illusion of equity.

73.      The Shell Company did not own any assets and would never own any assets.

74.     Plaintiff was not aware of the fraudulent nature of Defendants' representations at the time the representations were made, or he would have never accepted the offer of employment at CoreSite and never would have terminated his prior employment as a partner at a major Los Angeles law firm; sold his real properties in Los Angeles at significant losses and damage to his credit and associated tax liabilities; moved his family from California to Colorado; and accepted employment at CoreSite at a significantly reduced salary.

75.     Defendants' material and fraudulent misrepresentations were made for the sole purpose of inducing Plaintiff to accept employment at CoreSite in order to move its outside counsel to inside counsel at tremendous savings (in excess of $2,000,000.00) and then to avoid having to satisfy any obligation to pay him equity as originally promised and agreed.

76.     By virtue of the foregoing fraud and misrepresentations, Plaintiff was induced to accept employment at CoreSite and Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' misconduct, in an amount to be proven at trial. Plaintiff reserves the right to amend this Complaint and add a claim for punitive damages as a direct result of Defendants' fraud, deceit, deliberate acts, malice, and intentional conduct at the appropriate time.

## <u>SECOND CLAIM FOR RELIEF</u>

### (Breach of Contract Against All Defendants)

77.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

78.    Plaintiff entered into a contract with Defendants in which Defendants promised to provide Plaintiff with a significant and valuable equity position in CoreSite as compensation for his employment and as an inducement to relocate from California to Colorado.

79.     Defendants were fully aware that Plaintiff relied upon this promised equity position and contract in deciding to terminate his prior employment as a partner at a major Los Angeles law firm; selling his real properties in Los Angeles at significant losses (and incurring severe damage to his credit and associated tax liabilities); moving his family from California to Colorado; and accepting employment at CoreSite at a significantly reduced salary.

80.    Defendants contracted and promised that the equity position would supplement Plaintiff's income significantly.  Defendant Ray, both individually and on behalf of CoreSite and Carlyle, expressly represented that such equity position would likely be 0.70% of the "profit pool" at CRG West, L.L.C., which became CoreSite, and that the anticipated equity payment to Plaintiff (over a maximum period of 3 years) would be equal to a minimum of $550,000.00, but likely more.

81.    Defendants failed to fulfill their obligations under the contract by, among other things, failing to provide an equity agreement in CoreSite as promised; failing to provide equity in CoreSite or any other public or meaningful company; establishing a Shell Company to provide the mere illusion of equity when none existed; and failing to provide a compensation package in the amount as promised and in an amount that would justify Plaintiff's decision to leave his lucrative and prestigious position as a partner in a large Los Angeles law firm.

82.    Plaintiff substantially performed his obligations under the contract by, among other things, terminating his prior employment as a partner at a major Los Angeles law firm;

selling his real properties in Los Angeles at significant losses (and incurring severe damage to his credit and associated tax liabilities); moving his family from California to Colorado; accepting employment at CoreSite at a significantly reduced salary; and providing exceptional value and service to Defendants as an employee.

83. By virtue of the foregoing breach of contract, Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' breach, in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Willful And Wanton Breach Of Contract Against All Defendants)

84. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

85. Defendants purposefully breached the contract referenced in paragraphs 77-82 above, which they realized was done heedlessly and recklessly without regard to consequences or the rights of Plaintiff.

86. Defendants were conscious of their conduct and were fully aware at the time they entered into a contract with Plaintiff that they had no intentions of satisfying the contract and knew that they were not going to provide Plaintiff equity in CoreSite or any other publicly traded or meaningful company as contractually agreed and promised. Defendants were also consciously aware and knew that the equity agreement eventually provided to Plaintiff was worthless.

87. Defendants' contractual promises were made for the sole purpose of inducing Plaintiff to accept employment at CoreSite in order to move its outside counsel to inside counsel

at tremendous savings and then to avoid having to satisfy any obligation to pay him equity as originally promised and agreed.

88.     Defendants knew or should have known that their conduct would result in injury to Plaintiff.

89.     By virtue of the foregoing willful and wanton breach of contract, Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' willful and wanton breach, in an amount to be proven at trial.  Plaintiff reserves the right to amend this Complaint and add a claim for punitive damages as a direct result of Defendants' willful and wanton misconduct, fraud, deceit, deliberate acts, malice, and intentional conduct at the appropriate time.

## FOURTH CLAIM FOR RELIEF

### (Promissory Estoppel Against All Defendants)

90.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

91.     Defendants made promises to Plaintiff, which included a promise to provide him with a significant and valuable equity position in CoreSite as compensation for his employment and as an inducement to relocate from California to Colorado.

92.      Defendants were fully aware that Plaintiff relied upon this promised equity position in deciding to terminate his prior employment as a partner at a major Los Angeles law firm and move to Denver to commence employment at CoreSite at a significantly reduced salary.

93.     Defendants expressly knew, and should have otherwise reasonably expected, that the promise would induce action or forbearance by Plaintiff in choosing to accept their offer of employment.

94.     Plaintiff relied upon Defendants' promises to his detriment by, among other things, terminating his prior employment as a partner at a major Los Angeles law firm; selling his real properties in Los Angeles at significant losses (and incurring severe damage to his credit and associated tax liabilities); moving his family from California to Colorado; and accepting employment at CoreSite at a significantly reduced salary.

95.     The promises made to Plaintiff must be enforced to prevent injustice as Defendants were able to utilize the services of a very experienced and extremely well qualified and respected attorney without properly compensating him as agreed.

96.     By virtue of the foregoing misconduct and breach of promises, Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' misconduct and breach, in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment Against All Defendants)

97.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

98.     Defendants made promises to Plaintiff, which included a promise to provide Plaintiff with a significant and valuable equity position in CoreSite as compensation for his employment and as an inducement to relocate from California to Colorado.

99.     Defendants were fully aware that Plaintiff relied upon this promised equity position in deciding to terminate his prior employment and commencing employment at CoreSite at a significantly reduced salary.

100.     Plaintiff relied upon Defendants' promises to his detriment by, among other things, terminating his prior employment as a partner at a major Los Angeles law firm; selling his real properties in Los Angeles at significant losses (and incurring severe damage to his credit and associated tax liabilities); moving his family from California to Colorado; and accepting employment at CoreSite at a significantly reduced salary.

101.     Defendants received a tremendous benefit by being able to utilize the services of a very experienced and extremely well-qualified and respected attorney without properly compensating him as agreed.

102.     Plaintiff billed approximately 3,500 hours per year at CoreSite, on the low end, for a total of roughly 4,500 hours during his employment with CoreSite.  Plaintiff's billing rate to Defendant as outside counsel (prior to being lured in-house) was approximately $500 per hour. This, in and of itself, was a minimum net savings to Defendants of approximately $2,000,000.00 (over a period of 15 months), at the sole expense and detriment of Plaintiff and his family, and Plaintiff's reputation and career.

103.     Under the circumstances, it would be unjust for the Defendants to retain these and other benefits without commensurate compensation to the Plaintiff.

104.     By virtue of the foregoing misconduct and unjust enrichment, Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' misconduct and unjust enrichment, in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (Breach Of The Implied Duty Of Good Faith And Fair Dealing Against All Defendants)

105.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

106.   The contract between the parties to provide Plaintiff with an equity position in CoreSite, and to provide a written equity agreement, contained an implied duty of good faith and fair dealing.

107.   The written equity agreement that was eventually provided to the Plaintiff in December 2009 also contained the implied duty of good faith and fair dealing.

108.   Defendants were required to perform their contractual obligations in good faith and in a reasonable manner.

109.   Defendants were required to honor the reasonable expectations as expressed in the parties' contracts and agreements.

110.   Defendants breached this duty when they failed to act in good faith and act fairly in satisfying their contractual obligations and the reasonable expectations of the parties by, among other things, failing to provide any equity in CoreSite as originally agreed; having no intentions of providing said equity; drafting and submitting an equity agreement that was worthless and which provided "equity" in a Shell Company, and engaging in other similar conduct.

111.   By virtue of the foregoing breach of the implied duty of good faith and fair dealing, Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' breach, in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### (Wrongful Termination In Violation Of Public Policy
### Against Defendants CoreSite and Carlyle)

112.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

113.    Plaintiff was employed as General Counsel for CoreSite and was an officer of CoreSite.

114.    As CoreSite publicly stated in two Amended S-11's filed with the SEC, Plaintiff discovered that CoreSite and certain of its officers were involved in or committed certain illegal or improper acts, and Plaintiff was directed to perform certain illegal or improper acts as part of his work related duties, thereby subjecting him to potential sanctions and liabilities.  In addition, the actions directed by Defendants were in violation of Plaintiff's ethical obligations as an attorney under the Rules of Professional Conduct, which also establishes a clearly expressed public policy.

115.    Plaintiff was terminated as a direct result of his actions in advising Defendants of, and vigorously objecting to, the illegal or improper acts and in retaliation for such advisement and objections.

116.    Defendants were aware that Plaintiff's refusal to perform any illegal or improper acts and his insistence that any such illegal or improper acts be remedied immediately was based upon Plaintiff's reasonable belief that the acts were illegal or improper.

117.    By virtue of the foregoing wrongful termination, Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' misconduct, in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF

**(Outrageous Conduct And/Or Emotional Distress Against All Defendants)**

118.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

119.    Defendants engaged in extreme and outrageous conduct when they, among other things, made contractual promises to Plaintiff concerning his compensation package in a deliberate effort to induce him to accept employment at CoreSite when they knew those promises were false; lured Plaintiff to Denver under false pretenses, forcing him to sell his real properties in Los Angeles at significant losses significantly affecting his credit and tax liabilities; continued to make promises to Plaintiff concerning his equity position and long-term employment that they never intended to keep; provided an equity agreement in a Shell Company that owned no assets and would never own any assets; as stated in the S-11 Amendments filed by Defendants with the SEC, engaged in illegal or improper conduct and terminated Plaintiff when he vigorously objected to such conduct; and publicly introduced Plaintiff as their General Counsel including at a kick-off meeting with bankers and outside counsel, only to publicly announce his termination a few weeks later, thus causing Plaintiff tremendous embarrassment with coworkers, family, colleagues and friends.  Plaintiff was also forced to abruptly leave his place of employment in front of coworkers and friends, and his phone and computer access were immediately shut down without warning, after years of dedicated and loyal service to Defendants.

120.     Defendants' conduct exceeds the bounds of decency and is atrocious and intolerable in a civilized society.

121.     Defendants engaged in such conduct recklessly or with the intent of causing Plaintiff severe emotional distress.

122.     Defendants' conduct has caused Plaintiff severe emotional distress, resulting in, among other things, adverse physical manifestation.

123.      By virtue of the foregoing misconduct, Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' misconduct, in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF

### (Civil Conspiracy Against All Defendants)

124.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

125.     CoreSite, Carlyle, Defendant Ray, and Defendant Ruhlen had a meeting of the minds and agreed, by words or conduct, to accomplish the following unlawful goals, among others: made contractual promises to Plaintiff concerning his compensation package in a deliberate effort to induce him to accept employment at CoreSite when they knew those promises were false and fraudulent; continued to make promises to Plaintiff concerning his equity position and long-term employment that they never intended to keep; drafted a fraudulent equity agreement that provided "equity" in a Shell Company that owned no assets and would never own any assets; and as stated in the S-11 Amendments filed by Defendants with the SEC and as

alleged above, engaged in illegal or improper conduct and directed Plaintiff to perform certain illegal or improper acts.

126.    The above-referenced actions were unlawful for which all Defendants are responsible.

127.    By virtue of the foregoing misconduct and conspiracy, Plaintiff has been damaged, which damages are the natural and proximate consequences of Defendants' misconduct and conspiracy in an amount to be proven at trial.

WHEREFORE, Plaintiff Ari Brumer requests that the Court enter judgment in his favor and against Defendants as follows:

1.    For actual damages, including but not limited to, economic damages, expectation damages, non-economic damages, and other damages in an amount to be determined at trial;

2.    For special damages, including, but not limited to:

a.    $385,000.00 loss in real property value when Plaintiff was fraudulently induced to sell his property in Los Angeles and move to Denver;

b.    $490,000.00 loss in real property value when Plaintiff was fraudulently induced to sell his property in Los Angeles and move to Denver;

c.    $19,000.00 in moving expenses;

      d.      $15,000.00 loss in 2009 bonus with Plaintiff's prior employer;

      e.      $10,000.00 owed in back rent after Plaintiff was forced to terminate lease after being wrongfully terminated;

3.      For reasonable attorneys' fees and costs;

4.      For interest on said damages at the legal rate from the date such damages were incurred; and

5.      For such further relief as this Court deems just and proper.

6.      Plaintiff reserves the right to amend this Complaint to add additional damages as well as a claim for punitive damages as a direct result of Defendants' willful and wanton misconduct, fraud, deceit, deliberate acts, malice, and intentional conduct at the appropriate time.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS.**

DATED this 11th day of August, 2010

Respectfully submitted,

By:    s/*Ryan C. Carson*

Kevin S. Taylor (20209)
Ryan C. Carson (35251)
John M. Roche (11586)
TAYLOR|ANDERSON LLP
1331 Seventeenth Street, Suite 1050
Denver, Colorado 80202
Tel: (303) 551-6660
Fax: (303) 551-6655